## STATE EX REL. V. B. GING v. BOARD OF EDUCATION OF CITY OF DULUTH.
## STATE EX REL. ELIZABETH BUNTING v. SAME.[1]

December 31, 1942.

Nos. 33,214, 33,215.

[1]Reported in 7 N. W. (2d) 544.

Edward L. Boyle and Fryberger, Fulton & Boyle, for appellant (respondent below).

Oscar Hallam and Leslie S. High, for respondents (relators below).

STREISSGUTH, JUSTICE.

Respondent V. B. Ging was a·teacher in the Central High School of Duluth; respondent Elizabeth Bunting a primary teacher in Lester Park School of that city. Each had acquired a permanent status under the teachers tenure act. Minn. St. 1941, §§ 130.22 to 130.32 (Mason St. 1927, §§ 2935-1 to 2935-13). On August 30, 1941, each was notified of suspension from duty and served with a notice of hearing before the board of education on charges preferred by the superintendent of schools that "on account of lack of pupils and reduction in enrollment of pupils in the schools of said School District, the position of * * * [respondent], a teacher of said School District, has necessarily been discontinued and there is no position in said School District to which said teacher * * * [respondent], can be assigned." The hearings on the two charges were consolidated by consent. On September 23, 1941, separate decisions by the board were filed that "the position of * * * [respondent] as a teacher of The Independent School District of the City of Duluth has been and the same hereby is discontinued on

account of lack of pupils in the schools of said district and that said [respondent] be and (s)he hereby is discharged as a teacher of said district."

In each case a writ of *certiorari* was granted by the district court, where the cases were again consolidated, and, as was proper, presented to that court on the record of the proceedings before the board. The lower court, by separate orders dated January 29, 1942, made findings of fact and conclusions of law based on the record submitted to it for review and directed judgment to be entered. Included in the findings in each case is one numbered 6(c): "That no ground was established before said Board for said discharge." Included in the conclusions of law is the following: "That the decision of said Board of Education of the City of Duluth above mentioned and herewith reviewed should be, and it is, *set aside and vacated."* (Italics supplied.)

No judgment was entered in either case. The appeals are from the "Findings of fact, conclusions of law and order for judgment."

 Though respondents do not raise it, we are confronted with the question of the appealability of the lower court's order, which is in the form of ordinary findings and order for judgment in civil cases, from which no appeal lies. 1 Dunnell, Dig. & Supp. § 295, note 72.

At common law the proper form of judgment in *certiorari* proceedings was either that the proceedings below be quashed or that they be affirmed. Harris, The Law of Certiorari, p. 33, § 38; 1 Bailey, Habeas Corpus and Special Remedies, p. 746, § 189; 11 C. J. p. 209, § 376; 14 C. J. S., Certiorari, p. 319, § 174. Under our practice, *certiorari* is not the common-law writ, but rather a writ in the nature of *certiorari*, and the entry of a formal judgment of affirmance or reversal is neither contemplated nor authorized. Minn. St. 1941, p. 3622, c. 606 (Mason St. 1927, §§ 9769-9773) ; Johnson v. City of Minneapolis, 209 Minn. 67, 295 N. W. 406.

The order of the lower court here was "a final order, affecting a substantial right, made in a special proceeding," and therefore appealable under Minn. St. 1941, § 605.09 (Mason St. 1927, § 9498),

for it effectively and finally disposed of the proceedings of the tribunal below by ordering that the decision of the school board under review "should be, and it is, set aside and vacated." The direction to enter judgment was surplusage. Johnson v. City of Minneapolis, *supra;* McNamara v. Minnesota Central Ry. Co. 12 Minn. 269 (388); In re Estate of Bridgham, 158 Minn. 467, 197 N. W. 847; In re Trusteeship Under Will of Rosenfeldt, 184 Minn. 303, 238 N. W. 687. The issues presented are therefore properly here by appeal. Neumann v. Edwards, 146 Minn. 179, 178 N. W. 589; 1 Dunnell, Dig. & Supp. § 294; 14 C. J. S., Certiorari, p. 329, § 186a.

## FACTS IN GING CASE.

Virgil B. Ging entered the Duluth school system in 1909 and taught at its Central High School continuously thereafter until suspended in 1941. He was then 66 years of age. He taught mathematics for the first few years, but at all times thereafter his teaching was in the field of social science, particularly history and sociology. For years he had been, and at the time of his discharge was, the head of the social science department of Central High School, and as such he received extra compensation of $74 a year. For 25 years he had taught history in Room 100 of that school. He was teaching social science subjects when the tenure act was enacted and had been during his entire three-year probationary period, and he continued to teach such subjects exclusively thereafter. He had taught English, but this was before he entered the Duluth system. By the contract under which he attained tenure, he was hired as a teacher of social science; and, until the hearing before the school board, he never claimed that he was qualified to teach any other subjects nor had he asked for an assignment in any other field.

The necessity for reducing the teaching staff arose through a substantial drop in enrollment, not only in the elementary schools but in the secondary schools, including junior and senior high schools. The decrease in school enrollment in senior and junior

high schools combined, from the fall of 1940 to the fall of 1941, was 857, while the accompanying decline in the class enrollment was 2,642. However, the average size of classes was reduced, with the net result that the number of classes in the two divisions actually increased from 1,276 in 1940 to 1,282 in 1941. On the basis of one teacher to five classes, this meant one additional teaching position in the two high schools.

During the most recent years, there had been a trend away from academic subjects to vocational and commercial training; and in the case of languages, from French, Latin, and German to Spanish and Norwegian. The school had on its staff a large number of nontenure teachers working in specialized fields in which no tenure teachers had qualified. Among these specialized fields were the Smith-Hughes trades, band, music, physical education, and teaching of subnormal children.

In social science subjects the enrollment at the beginning of the 1940 school year in the senior high schools was 3,423, and in the junior high schools 2,831. The following year the enrollment in these subjects in the senior high schools had dropped to 3,284, and in the junior high schools to 2,564. The total drop in secondary schools was from 6,254 to 5,848. Over the same period, notwithstanding the drop in general enrollment, there had been an increase of five enrollments in home training, 54 in industrial arts, and a drop of only 17 in commercial classes.

There was also a reduction from 1940 to 1941 in the average high school class size of about two pupils per class, so that the number of classes was not decreased in proportion to the reduction in enrollment. The size of the classes in the Duluth schools is low compared with the size in other cities throughout the country. It was estimated that 15 classes at the senior high school could have been eliminated without having a single class with more than 36 pupils. However, this number of classes was not in fact eliminated.

In the 1940-1941 school year there were more tenure teachers available than could properly be assigned to a reasonable ratio of

the number of pupils per teacher. At the opening of the 1941-1942 school year the board was faced with a further reduction in the school population and an enrollment drop of 624 pupils, which, on the average of 30 pupils per teacher, would mean a drop of 21 teachers.

The reduction in the total enrollment and the trend away from classes in the academic department made necessary a reduction in the staff of teachers. Throughout the 1940-1941 school year, the superintendent of schools, with the knowledge and approval of the board, sought to bring about the necessary reduction by voluntary retirement of teachers and by liberalizing the rules under which leaves of absence were granted, but without success.

The matter was referred to a committee of the board, which made a report on July 16, 1940, recommending that "contracts for all junior and senior high school teachers who will have attained the age of 62 before the opening of the school year 1940-41 be withheld pending the assignment of all other teachers." The report was adopted by the board.

On July 19, 1940, the superintendent sent out a special bulletin to all teachers calling attention to the necessity of reducing the staff and the proposed policy whereby it was hoped that this could be accomplished. In a special letter to respondent Ging, the superintendent also called attention to the fact that respondent's pension under the retirement plan would be $1,378.80 a year.

Following this and other correspondence, Ging met with the board on August 29, 1940, and stated that he would be willing to retire if he could serve one more year, with which understanding he was reëlected for another year and so advised on September 9, 1940. However, in the spring of the following year Ging again applied for a contract.

On May 28, 1941, the superintendent submitted to the board a report recommending: (1) Writing to all married women teachers not widowed or divorced that requests for leaves of absence from such married women would in most cases be granted; (2) urging those who planned on retirement or who could retire to do so;

(3) that a "sufficient number of contracts be withheld to permit the assignment of the balance of the staff, and that the criteria used be the same as for 1940-41, namely, using age as the basis for withholding contracts."

The superintendent's report was submitted to an informal meeting of the board on May 28, 1941, at which the board concurred in many of his recommendations, but "urged that not only age be used as the criteria in recommendation No. 3, but that due consideration be given to teaching ability without using age as a factor."

On June 24, 1941, the superintendent submitted a further report, including tentative lists of teachers to be assigned for the ensuing year, eliminations being based upon: (1) Marriage status of women teachers "whose husbands are gainfully employed and who for the most part are not rated as outstanding or exceptional teachers"; (2) eligibility for retirement pay; (3) health; (4) age. On June 25, 1941, upon unanimous action of the board, formal notices of intention to hire them were sent to those teachers on the tentative assignment list, not including respondents Ging and Bunting. Instead, Ging received a letter dated June 25, 1941, advising him that no assignment existed for him, that he would be placed on the unassigned list, and that "a formal hearing under the tenure act upon request of those who are not assigned will not take place until later. Each one affected will be given an opportunity to either take leave of absence for the year or will be permitted a formal hearing under the provisions of the tenure act."

An insufficient number of teachers having consented voluntarily to retire or to go on leave, the superintendent on August 4, 1941, wrote to the junior and senior high school teachers eligible for retirement that there were still four junior and senior high school teachers unassigned with only two positions available, urging them individually to submit notice of any contemplated retirement. A similar letter was written to all married women in elementary and junior and senior high school divisions on the same date. As a result of these letters one resignation was forthcoming from a married woman, and one married woman asked for one semester's

leave. One teacher who was about to be married sought a leave of absence, and another brought in a resignation.

On August 14 the superintendent submitted an extensive report to the board selecting specifically the names of those who were to be omitted, including Ging and three others. Of these three, one resigned, but two were later transferred to other positions.

On August 18, 1941, the board, at an informal meeting, "approved the policy of staff reduction outlined by the superintendent," including "the withholding of a contract for V. B. Ging." Accordingly, on August 20, 1941, the superintendent wrote Ging advising him that "at an informal meeting of the Board held recently it was the unanimous opinion of those present that the superintendent should ask you to retire at this time." Ging refused to resign, and the board thereupon filed formal charges against him on August 30, 1941. These charges alleged that "on account of lack of pupils and reduction in enrollment of pupils in the schools of said School District, the position of V. B. Ging, a teacher of said School District, has necessarily been discontinued and there is no position in said School District to which said teacher, V. B. Ging, can be assigned."

A hearing on the charges was duly held beginning on September 15, 1941, and on September 23, 1941, the board rendered a written decision containing findings summarizing many of the facts we have already recited, and finding specifically:

"7. That the Board determined that, in case involuntary retirements became necessary, the positions of the older teachers and married women teachers of said district, who had not retired in accordance with said voluntary plans of retirement and leaves of absence, should be discontinued.

"That the older teachers of the district may, upon retirement as teachers, receive pensions for the balance of their lives from the Duluth Teachers Retirement Fund Association and said pensions will be paid out of a fund raised in part by taxation. That said teacher, V. B. Ging, may, upon retirement, receive such a pension

in the amount of $1,408.00 per year. That the policy referred to in this paragraph was recommended by the Superintendent of Schools and approved by the Board in good faith and in the belief that it is more equitable to retire an older teacher who is in a position to receive such a pension and who, on account of his age, will in any event be obliged to retire within a comparatively short time, or a married woman who has a husband to support her, than it is to retire some other teacher, and the enforcement of such policy, whenever involuntary retirements become necessary on account of a lack of pupils, is for the best interests and the benefit and advantage of the district.

"That said teacher, V. B. Ging, was born on the 7th day of November, 1874, and is one of the older teachers of said district and of the secondary schools thereof and of the social science department of said secondary schools and, in accordance with the policy adopted by the Board, the position of said teacher, V. B. Ging, was, on August 20, 1941 [10 days prior to filing of charges] discontinued on account of lack of pupils and reduction in the enrollment in the schools of said district and there is no position in the schools of said district to which said teacher, V. B. Ging, can be assigned unless a position now held by a tenure teacher be assigned to him."

Then followed the board's decision:

"'* * * on account of the facts aforesaid, it is adjudged and decreed *that the position of V. B. Ging as a teacher of The Independent School District of the City of Duluth has been and the same hereby is discontinued on account of lack of pupils* in the schools of said district and that said V. B. Ging be and he hereby is discharged as a teacher of said district." (Italics supplied.)

This constitutes only a summary of the 774-page record, replete with exhibits and statistics, which has been submitted to us. Other facts will be referred to later in the opinion.

## FACTS IN BUNTING CASE.

Elizabeth Bunting had been a teacher in the primary grades in Duluth since 1901 and until suspended in 1941. She was then 65 years of age. She taught at both the Jefferson and Lester Park schools and had been at the latter continuously for about 14 years. She taught in the first, second, and third, or primary, grades at various times and at the time of her suspension was teaching two grades, the second and third. She acquired a permanent status under the teachers tenure law on July 1, 1927, the effective date of the law.

For a period of at least nine years prior to her suspension, the total enrollment in the entire school system had decreased by 4,331. The total enrollment in the elementary schools decreased from a total of 12,526 in 1931 to a total of 11,163 in 1935, and to a total of 7,749 on September 12, 1941. *There is no proof in the record as to the loss, if any, in the enrollment in the primary grades.*

The superintendent of schools made an unsuccessful effort, in much the same manner as we have already discussed at length in reciting the facts in the Ging case, to bring about the necessary reduction in the staff of elementary teachers by voluntary retirement of some of the teachers and by liberalizing the rules under which leaves of absence were granted. It therefore became necessary to withhold contracts from some of the teachers. The superintendent and the board, after discussing various plans and policies to be adopted in accomplishing a reduction in the teaching staff, finally determined that, in case involuntary retirements became necessary, (1) the older teachers with large retirement benefits and (2) the married women teachers with independent sources of income should be refused assignments. In the case of Miss Bunting the pension to which she was entitled at her age of 65 years was $666.70 a year. She therefore fell into the first of the categories specified. On August 20, 1941, the superintendent wrote her:

562

"This is to advise you that at an informal meeting of the Board held recently it was the unanimous opinion of the members present * * * that the superintendent should omit from the organization elementary teachers who have reached a certain age. Since you come within the category, it is expected that you will be retiring at this time. * * * there is no position for you."

Nevertheless, Miss Bunting refused to resign. Formal charges were thereupon preferred against her, alleging that "on account of lack of pupils and reduction in enrollment of pupils in the schools of said School District, the position of Elizabeth Bunting, a teacher of said School District, has necessarily been discontinued and there is no position in said School District to which said teacher, Elizabeth Bunting, can be assigned."

The board, after a statutory hearing, found substantially all of the foregoing facts in formal findings, and on August 30, 1941, made its decision that "on account of the facts aforesaid, it is adjudged and decreed that the position of Elizabeth Bunting as a teacher of The Independent School District of the City of Duluth has been and the same hereby is discontinued on account of lack of pupils in the schools of said district and that said Elizabeth Bunting be and she hereby is discharged as a teacher of said district."

The following additional facts were shown and are entitled to consideration: The reduction in the teaching force in the Lester Park school was from nine to eight teachers. The school board in filling individual vacancies in the three divisions of its school system—elementary schools, junior high schools, and senior high schools—shifted teachers from one division to the other. Thus, in the fall of 1941, three teachers were transferred from the junior high school to the elementary grades, and two were transferred from the elementary schools to the junior high school. These transfers from high school to the grades tended to fill up vacancies in the elementary schools and of course to create vacancies in the high schools.

In the fall of 1941 three teachers then on leaves of absence were called back from their leaves and assigned to positions which might have been filled for the time being by Miss Bunting. Another teacher on maternity leave was called back and assigned to a position.

### CONSTRUCTION AND APPLICATION OF TENURE LAW.

■ The teachers tenure law, originally enacted ·by L. 1927, c. 36, Mason St. 1927, § 2935-1, *et seq.*, was reënacted and made a part of L. 1941, c. 169, art. 10, §§ 22 to 32, Minn. St. 1941, §§ 130.22 to 130.32. It applies only to cities of the first class.

Section 130.25 specifies five "causes for the discharge or demo· tion of a teacher either during or after the probationary period [three years]," including "discontinuance of position or lack of pupils," here relied on; § 130.26 provides for written charges and a hearing, after notice, before the school board; § 130.27 guarantees the "right to be represented by counsel" and the right to "examine and cross-examine witnesses and present arguments"; § 130.28 provides for a private or public hearing "at the decision of the teacher"; and § 130.29 provides for a "decision in writing," stating the grounds on which it is based, rendered within 25 days after giving of such notice upon "the affirmative vote of a majority of the members of the school board."

Respondents premise their attack upon the proceedings of the school board by asserting that, though the statutory procedure was followed, the board had predetermined the issues involved and had, in fact, made its decision to discharge respondents at its meeting on August 20, 1941, or ten days before formal charges were preferred, thereby depriving respondents of due process of law.

The answer to this proposition requires a reconsideration of the nature, functions, and *modus operandi* of administrative tribunals and the distinction between them and judicial tribunals. The cases cited by counsel (Burton v. Platter [8 Cir.] 53 F. 901, and Windsor v. McVeigh, 93 U. S. 274, 23 L. ed. 914), are not controlling because they involve judicial and not administrative proceedings.

As said in State ex rel. Rockwell v. State Board of Education, 213 Minn. 184, 191, 6 N. W. (2d) 251, 258:

"Neither the federal nor the state constitution guarantees any particular form of administrative procedure."

All that is required is that "the liberty and property of the citizen shall be protected by the rudimentary requirements of *fair play*." (Italics supplied.) Morgan v. United States, 304 U. S. 1, 14, 58 S. Ct. 773, 775, 999, 82 L. ed. 1129, 1130; Federal C. C. v. Pottsville Broadcasting Co. 309 U. S. 134, 60 S. Ct. 437, 84 L. ed. 656; Hawkins v. Common Council, 192 Mich. 276, 158 N. W. 953, Ann. Cas. 1917E, 700; 19 Minn. L. Rev. 265; Pillsbury, "Administrative Tribunals," 36 Harv. L. Rev. 583, 587. This is not to say that administrative proceedings may not be so lacking in the fundamentals of a fair hearing as to be contrary to the requirements of due process of law, as where no notice is given or hearing granted (Southern Ry. Co. v. Virginia, 290 U. S. 190, 54 S. Ct. 148, 78 L. ed. 260), or where the administrative board is actuated by personal interest or by malice and ill-feeling toward the person sought to be removed (Hawkins v. Common Council, *supra*).

While a school board in the exercise of its power of removal of teachers is a quasi judicial body, it does not thereby lose its identity as an administrative body and become a court; hence the regularity of its action cannot be tested by strict legal rules prevailing in court proceedings. State ex rel. Rockwell v. State Board of Education, *supra;* State ex rel. Cochrane v. Peterson, 208 Minn. 361, 294 N. W. 203; State ex rel. Hardstone Brick Co. v. Dept. of Commerce, 174 Minn. 200, 219 N. W. 81; State ex rel. Chapman v. State Board of Medical Examiners, 34 Minn. 387, 26 N. W. 123; Pillsbury, "Administrative Tribunals," 36 Harv. L. Rev. 405, 410, 412; State ex rel. Starkweather v. Common Council, 90 Wis. 612, 64 N. W. 304; Hawkins v. Common Council, 192 Mich. 276, 158 N. W. 953, Ann. Cas. 1917E, 700, *supra*. The right of review to determine whether its findings are based upon substantial evidence or whether they are arbitrary, oppressive, and therefore

in excess of its powers satisfies the requirements of due process. Arkansas Wholesale Grocers Assn. v. Federal Trade Comm. (8 Cir.) (1927) 18 F. (2d) 866, 871, *certiorari* denied, 275 U. S. 533, 48 S. Ct. 30, 72 L. ed. 411.

Criticisms have often been made of the phenomenon which permits an administrative body to serve in the triple capacity of complainant, prosecutor, and judge. See Report of Special Committee on Administrative Law, 59 Am. Bar Assn. Rep. (1934), 539, 544, 549; Henderson, Federal Trade Comm. 328, 329; Pillsbury, "Administrative Tribunals," 36 Harv. L. Rev. 405. As a result of this combination of roles, its final adjudication often lacks that stamp of impartiality and of disinterested justice which alone can give it weight and authority.[2]

This anomaly in procedure makes it vitally necessary that in reviewing administrative decisions courts zealously examine the record with a view to protecting the fundamental rights of the parties, lest the rule against arbitrariness and oppressiveness becomes a mere shibboleth. An appeal being denied, a review by *certiorari* or other prerogative writ must not be permitted to degenerate into a mock ceremony. The least that the courts can do is to hold high the torch of "fair play," which the highest court of our land has made the guiding light to administrative justice. Morgan v. United States, 304 U. S. 1, 58 S. Ct. 999, 82 L. ed. 1129, *supra*. This was the view expressed in Cooke v. Dodge, 164 Misc. 78, 299 N. Y. S. 257, 263, involving discharge of a teacher, where it was said:

---

[2]"The rule of review over administrative determinations is the battle ground of current literature in this field of law." Report of Special Committee on Administrative Law, 59 Am. Bar Assn. Rep. (1934), 328, listing voluminous material. See also "Functions and Procedure of Administrative Tribunals," 12 U. of Cincinnati L. Rev. 117-287; Black, "The 'Jurisdictional Fact' Theory and Administrative Finality" (1936-1937), 22 Corn. L. Q. 349, 515; Landis, "Administrative Policies and the Courts," 47 Yale L. J. 519; Fuchs, "Concepts and Policies in Anglo-American Administrative Law Theory," 47 Yale L. J. 538.

"This court will be quick to discover any unfairness or any act done or taken by the board which unfavorably affects the rights of this plaintiff, and will be equally as quick to set aside any determination made by the board based upon illegal evidence or unfair and prejudicial conduct of the board."

The handicap confronting administrative bodies suggests to us, as it did to the American Bar Association committee, the advisability of segregating their judicial functions from their legislative and executive functions and of placing the ultimate determination of judicial questions in an administrative court or other independent tribunal. Until there is such a divorce between the complainant and the judge in administrative proceedings, we must recognize and accept though reluctantly the apparently irresistible tendency of administrative bodies everywhere to predetermine matters of a judicial nature coming before them.

The advisability of granting the power of review in school matters to a state board of appeal was recognized early in the history of public education. Acting upon the recommendation of the state superintendent's report for 1822, the New York general assembly empowered that officer to decide school controversies. Other states followed New York's lead, until to date 35 states have given appellate jurisdiction to the state superintendent or the state board of education, or both, although the extent of delegated powers varies considerably in the individual states.[3]

The National Educational Association has recommended granting the right to remove tenure cases to the courts for trial *de novo*, as well as the right to appeal to a state tenure commission, upon which the teachers, as well as the public, may be represented.[4]

[3]See brochure, "To Whom May Aggrieved Teachers Appeal?" Committee on Tenure, National Educational Association of the United States, February 1941.

[4]"The original trial should be before the schoolboard so that all the evidence may be presented before the teacher goes to the expense of court proceedings.

"The decision of the schoolboard, however, should not be considered

There are, however, some constitutional difficulties in granting to courts a trial *de novo*, for, as we shall point out later, the door has been closed to complete judicial review on questions of fact, the sole permissible inquiry being whether there is any evidence to sustain the findings of the administrative board. "With such a restriction," said the American Bar Association's special committee (59 Am. Bar Assn. Rep. 547), "the right of judicial review becomes, in the great majority of cases, a mere empty shell, particularly when the administrative tribunal (through its attorneys), consciously frames its findings of fact with an eye not so much to the evidence as to justify an *a priori* decision." An unscrupulous board or its unscrupulous attorney might be tempted to say, "Let me find the facts, and I care little who lays down the general principles."

The school board here, however, confronted as it was with the only procedure open to it, necessarily did predetermine, though only tentatively, the question of whom to discharge. However, with the inadequate tools provided and with the added difficulty of a triple personality, the board in making its preliminary decision acted as cautiously and judiciously as possible, though upon an erroneous theory of law, as we shall later point out. Before any teacher was marked for dismissal, the board exhausted every effort to procure from tenure teachers voluntary retirements and applications for leaves of absence. More than a year was spent by the board and the superintendent in discussing and determining policies and methods to be used in reducing the teaching staff. The tentative decision to discharge the respondents having been arrived at, the final decision was withheld until they were given due notice

---

final. Rather, the tenure law should provide for court action as soon as possible after the schoolboard's decision so that the suspension of the teacher pending trial may be as brief as possible—this for the good of the administration and the teacher. Provision should be made for a direct appeal to the courts for a full trial *de novo* and for appeal to a state tenure board on which members of the teaching profession are included." National Educational Association's "Critical Analysis of Teacher Tenure Legislation" (January 1939) p. 28.

and an opportunity to be heard, as provided by the tenure law. This satisfied the requirements of the due process rule.

■ The tenure law is "wise legislation, promotive of the best interests not only of the teachers affected but of the schools as well." Oxman v. Independent School Dist. 178 Minn. 422, 426, 227 N. W. 351, 352. As well stated by Mr. Justice Olson in McSherry v. City of St. Paul, 202 Minn. 102, 108, 277 N. W. 541, 544:

"Plainly, the legislative purposes sought were stability, certainty, and permanency of employment on the part of those who had shown by educational attainment and by probationary trial their fitness for the teaching profession. By statutory direction and limitation there is provided means of prevention of *arbitrary* demotions or discharges by school authorities. The history behind the act justifies the view that the vicissitudes to which teachers had in the past been subjected were to be done away with or at least minimized. It was enacted for the *benefit and advantage of the school system* by providing such machinery as would tend to minimize the part that malice, political or partisan trends, or caprice might play. It established *merit* as the essential basis for the *right* of permanent employment. On the other hand, it is equally clear that the act does not impair *discretionary* power of school authorities to make the best selections consonant with the public good; but their conduct in this behalf is strictly circumscribed and must be kept within the boundaries of the act. * * * it is our duty so to construe such parts of the act which on their face do not clearly delineate the legislative intent as will bring about a result in harmony with the expressed legislative policy."

Clearly, the statute should receive a construction in harmony with its well understood purposes, yet not one so liberal as to result in subordinating the paramount rights and welfare of the public at large and of the school children to those of the individual teachers. The adoption of a liberal construction to combat the evils to which the law was directed does not permit a construction so benevolent toward teachers that, by eliminating one evil, we

create another: that of transferring from the school boards, the duly elected representatives of the parents, taxpayers, and other electors of the school district, to the teachers and the courts the management, supervision, and control of our school systems vested in such boards by other statutes. See Minn. St. 1941, §§ 125.01, 125.06, subds. 1 and 9 (Mason St. 1927, §§ 2804, 2805, 2806, 2815, et seq.), and Sp. L. 1891, c. 312, creating the board of education of Duluth. That it was not intended that such "care, management or control of the school in which the teacher is employed" was to be surrendered by the "school board or commissioner having charge of the school" is definitely shown by the quoted phrases we have lifted from the tenure act itself. See Minn. St. 1941, §§ 130.25(2), 130.26 (Mason St. 1927, §§ 2935-6, 2935-7). The administrative officers of our school system should not, by judicial interpretation of the law, be converted into mere robots and deprived of all right honestly to determine matters of policy in the administration of school affairs.

■ A fundamental principle of our constitutional system is that governmental powers are divided among the three separate departments or branches of government: legislative, executive, and judicial. Minn. Const. art. 3, § 1. This principle operates broadly to confine legislative matters to the legislature, executive matters to the executive branch, and those which are judicial in character to the judiciary. State ex rel. Young v. Brill, 100 Minn. 499, 111 N. W. 294, 639, 10 Ann. Cas. 425.

A school board is a part of the executive department, but, in the operation of our public school system, it exercises not only purely administrative functions but others of a legislative character, and still others of a quasi judicial character. Of the administrative type are the hiring of teachers, their assignment in the school system, and their discharge, once the grounds therefor are established. Of the legislative type are the making of rules and the determination of policies governing such hiring, assignment, and discharge of teachers. Of the quasi judicial type is the power to hear and determine proceedings for the removal of teach-

ers for cause. Once the ground of discharge is judicially decided to exist, the policy or rules to be followed in exercising such power, *i. e.*, in determining which particular teacher or teachers are to be discharged, is an executive function, over which the courts can exercise little or no control, as we will later show. If we keep in mind the triple personality of school boards, the complex problems presented in the present appeal will be simplified.

The very fact that a hearing is required where the asserted ground for discharge is "discontinuance of position or lack of pupils" indicates that the legislature did not intend to leave the question of the actual existence of such ground to the arbitrary whim of the school board, but, as in other cases, to require the exercise of a sound and honest discretion based upon existing facts and circumstances of a substantial nature and upon a correct theory of law. But this is the full extent to which courts are permitted to inquire. The field of judicial inquiry is not enlarged in the case of discharge of teachers for cause, essentially an executive function, by the fact that a legislative act requires such court trappings as formal charges, notice, and a hearing. State ex rel. Hart v. Common Council, 53 Minn. 238, 55 N. W. 118, 39 A. S. R. 595; State ex rel. Kinsella v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785; In re Removal of Nash, 147 Minn. 383, 181 N. W. 570; 10 Am. Jur., Certiorari, p. 539, § 15; Gordon, "Administrative Tribunals and the Courts," 49 L. Q. Rev. 95, 116; Brown, "Administrative Commissions," 19 Minn. L. Rev. 261; Pillsbury, "Administrative Tribunals," 36 Harv. L. Rev. 405, 410, 412, 418, 419; 20 Minn. L. Rev. 193.

Complete jurisdiction cannot, either directly or indirectly, be conferred upon the courts in view of the constitutional division of the powers of government. State ex rel. Luley v. Simons, 32 Minn. 540, 21 N. W. 750; Hunstiger v. Kilian, 130 Minn. 474, 153 N. W. 869, 1095; *Id.* 136 Minn. 64, 161 N. W. 263; Federal Radio Comm. v. General Elec. Co. 281 U. S. 464, 50 S. Ct. 389, 74 L. ed. 969, 971; yet a limited jurisdiction by way of *certiorari,* and in

some cases by statutory appeal, is conferred upon the courts. This is necessarily confined to questions affecting the jurisdiction of the board, the regularity of its proceedings, and, as to merits of the controversy, whether the order or determination in a particular case was arbitrary, oppressive, unreasonable, fraudulent, under an erroneous theory of the law, or without any evidence to support it. A court cannot put itself in the place of the board, try the matter *de novo*, and substitute its findings for those of the board. State ex rel. Hart v. Common Council, 53 Minn. 238, 55 N. W. 118, 39 A. S. R. 595, and State ex rel. Kinsella v. Eberhart, 116 Minn. 313, 133 N. W. 857, 39 L.R.A.(N.S.) 788, Ann. Cas. 1913B, 785, *supra;* and see Hunstiger v. Kilian, *supra;* Brazil v. County of Sibley, 139 Minn. 458, 166 N. W. 1077; *Id.* 148 Minn. 164, 181 N. W. 329. Errors of the board committed within its jurisdiction are not subject to review. As said in Lindquist v. Abbett, 196 Minn. 233, 240, 265 N. W. 54, 57, "executive officers as well as judges have a power to decide erroneously as well as rightly. There is a wide field wherein their decision, even though wrong, is final."

It is significant that the tenure act itself gives no right of appeal, leaving a discharged teacher only the right to a review by a prerogative writ; but, as pointed out by Warren H. Pillsbury in his article on "Administrative Tribunals," 36 Harv. L. Rev. 583, 588:

"* * * the prerogative writs, such as *certiorari,* prohibition, *mandamus,* and *habeas corpus* * * * usually lie only to determine the jurisdiction of the inferior tribunal exercising the judicial or *quasi*-judicial function, and not to correct errors committed in the course of the jurisdiction. * * * They cannot be used to review decisions purely of fact or to determine the weight of evidence, nor to review decisions based upon conflicting evidence."

So here, neither the district court on *certiorari* nor this court on appeal could interfere with the school board in its decision as to the existence of statutory grounds for discharge, provided the

board acted in good faith and on a correct interpretation of the law. The legislature never so intended by the enactment of the teachers tenure act. A statute which so provided would be unconstitutional as a delegation to the judiciary of nonjudicial powers. State v. G. N. Ry. Co. 130 Minn. 57, 153 N. W. 247, Ann. Cas. 1917B, 1201; Federal Radio Comm. v. General Elec. Co. 281 U. S. 464, 50 S. Ct. 389, 74 L. ed. 969, *supra.*

As we have already indicated, once the existence of the power of removal, *i. e.,* the existence of statutory grounds, is judicially decided by the board under a correct theory of the law, the manner of the exercise of that power is purely a question of school policy. Once the board properly decides that one or more of its teaching staff must be discharged because of "discontinuance of position or lack of pupils," it ceases to act in a quasi judicial capacity, and the manner of the exercise of the power to discharge so established is an executive or legislative question. The board, acting under powers delegated to it by the legislature, may adopt rules determining which of the surplus teachers shall be removed.

The power of the courts to interfere either with the making of the rules or with their enforcement does not exist, even though such rules may be entirely arbitrary or may be based upon economic rather than educational considerations. As said by Pillsbury in his article previously referred to (36 Harv. L. Rev. 583, 589):

"* * * purely administrative questions cannot be reviewed by the courts by * * * prerogative writs or otherwise. Where an administrative officer is vested with discretion to determine a particular question of policy, that discretion cannot be exercised for him by the courts. His decision is final upon the question of policy."

Courts cannot, under the guise of exerting judicial power, usurp merely administrative functions by setting aside an order or rule of an administrative board within the scope of the power delegated to it, upon the ground that such power was inexpediently

exercised. "Power to make the order, and not the mere expediency or wisdom of having made it, is the question." I. C. C. v. Illinois Cent. R. Co. 215 U. S. 452, 470, 30 S. Ct. 155, 160, 54 L. ed. 280.

Courts are not at liberty to declare administrative rules and policies invalid on the ground that such rules or policies may afford an opportunity for abuse in the manner of application, may create hardships or inconvenience, or may be unfair, oppressive, or mischievous in their effect, and of doubtful propriety. This does not mean that courts may not inquire whether a rule or policy is arbitrary or capricious; that is, whether or not it has reasonable relation to a legitimate end. If, however, there is room for fair debate as to whether the rule or policy is arbitrary or unreasonable, the courts will not substitute their own judgment for that of the administrative body charged with the primary duty and responsibility of determining the question. 11 Am. Jur., Const. Law, p. 802, § 136.

The propriety, justice, wisdom, necessity, utility, and expediency of rules and policies adopted by a school board are exclusively matters for the board to determine. Each of these factors has been many times specifically repudiated as a possible basis for invalidating legislation. 11 Am. Jur., Const. Law, p. 802, *et seq.*, §§ 136-138; 1 Cooley, Const. Lim. (8 ed.) 341-348. This judicial position has given rise to the oft repeated mandate, applying with equal force to administrative rules as to laws, that courts can have no concern as to the expediency, wisdom, or necessity for the enactment of laws. The only question for the courts to decide is one of power, not of expediency or wisdom, and laws or rules will not be declared void simply because, in the opinion of the court, they are unwise or unjust or violate the national, social, or political rights of the citizen or teacher, unless it can be shown that such injustice is prohibited or such rights guaranteed or protected by the constitution. 1 Cooley, Const. Lim. (8 ed.) 341. Whether an enactment of law or rule is wise or unwise, whether it is based on sound economic theory, whether it is the best means to achieve the desired result, whether, in short, the legislative or

administrative discretion within its prescribed limitation should be exercised in the particular manner are matters for the judgment of the legislative or administrative body, and the earnest conflict of serious opinion does not suffice to bring them within the range of judicial cognizance.

The board having judicially decided that a statutory ground for discharge of one or more teachers existed, the question as to which particular teacher or teachers were to be the victims of the situation was purely one of policy for the board to determine, and we cannot interfere with its determination thereof even though the board may have acted and taken into consideration economic as well as educational factors.

Our teachers should be the first to recognize that the tenure law was not intended as a guarantee of continuous employment during good health and good behavior, regardless of whether the number of pupils or the availability of positions justifies their continued retention. 10 Am. Jur., Civil Service, p. 933, § 12. The tenure act did not transform teachers acquiring a status thereunder from employes of the school district into public officers, nor metamorphose them from servants into masters. Theirs is still an employment affected by a public interest; and, absent any contract rights, the statute does not prevent their discharge when the purpose for which they were employed ceases.

In California and New Jersey, and perhaps in other states, where removal is sought on grounds not personal to the teacher, such as loss of pupils, lack of funds, etc., the statutes expressly provide that removal may be at the discretion of the school board. Our statute contains no such distinction and requires charges, notice, and a hearing notwithstanding the asserted ground for discharge is "discontinuance of position or lack of pupils." Those provisions, and the further one requiring that the school board shall decide the question whether or not such "charges, or any of such, are * * * true," clearly indicate that the only judicial question involved is the determination of the truth of the charges.

"Discontinuance of position or lack of pupils" is not a ground

involving to any extent the personal qualifications of the teacher. The law is silent as to the manner of exercising such power as between two or more tenure teachers. Hence, where the school board has properly determined that the right to discharge two or more teachers exists by reason of such cause or causes, it is a question of administrative policy how the right or power shall be exercised.

Lindquist v. Abbett, 196 Minn. 233, 265 N. W. 54, involved the right of a school district to employ an attorney from month to month or by the year, instead of intermittently, in special matters which might arise from time to time. The right to employ an attorney was conceded, but objection was made to the manner of the employment, to-wit: by the month. The court said (196 Minn. 238, 265 N. W. 56):

"Given the power to employ, how comes it that the manner of employment is restricted?

"The power comes from the statute, which is silent as to the manner of its exercise. It must follow then, and we so hold, that the terms of employment are left to the discretion of the school board. That discretion being executive, its exercise is not subject to review generally by the judiciary. There may arise cases where its exercise, when challenged in appropriate litigation, will appear to have been in bad faith, or so unreasonable as to be arbitrary and capricious and, hence, beyond the power granted. It will be time enough to consider such an issue when it is presented. It is not here."

This furnishes an adequate answer to respondents' argument in the present case. In case of a substantial drop in the enrollment, it is for the school board (1) in the exercise of its quasi judicial functions, to determine whether the loss in pupils is serious enough to require a reduction in the teaching force, and (2), in the exercise of its executive or administrative functions, to determine how the reduction, if any, should be accomplished as between numerous qualified tenure teachers.

Having determined that loss of pupils requires a reduction of the teaching force, the school board should adopt a reasonable plan or policy to accomplish that purpose, taking into consideration all facts and circumstances bearing a direct, special, and substantial relationship to the question to be decided. Obviously, it should not determine the victims of the situation by lot, or alphabetically, or by the color of their eyes or hair, for such methods would be capricious and would have no relation to the subject matter in hand. However, this is not equivalent to saying that the board could not consider such factors as age, marriage, comparative salaries of old and new teachers, financial status, experience, or qualifications to teach in particular subjects under standards then obtaining, for each of these would have a direct and important bearing in determining the fairest solution of the difficult problem presented.

■ It would have been perfectly proper for the board to consider seniority[5] and experience in giving preference to an older teacher over a younger one; but if the board in good faith adopted the contrary yardstick and determined that younger teachers should have the call because of greater vigor or because of their more recent completion of modern courses in their particular fields, no court could set aside any such decision on the ground of error of judgment on the part of the board. The board might also, as it did in the cases at bar, consider that the employment of younger teachers would result in substantial savings to the taxpayers because of the lower rate of pay to the younger group.

Nothing to the contrary was said in State ex rel. Evens v. City of Duluth, 195 Minn. 563, 262 N. W. 681, 263 N. W. 912, 266 N. W. 736. The gist of that decision is that the soldiers preference act does not give an ex-serviceman the right to remain in the employ-

---

[5]In recommending principles to be incorporated in teachers tenure legislation, the National Educational Association in its brochure, "Critical Analysis of Teacher Tenure Legislation" (January 1939), p. 27, recommended that "every tenure law should provide for decrease in teaching positions or elimination of a type of service, but should make such provisions definite and following the principle of seniority."

ment of a city as against another competent employe who is senior to the serviceman where, for lack of funds, the employment of one of them must be and is terminated. The court held that the city had the right to exercise and determine for itself which of two employes should retain the position, and that it could take seniority into consideration, which was a proper exercise of the discretion vested in the city council. It did not determine that seniority entitled an employe to a position as a matter of right.

"Aside from contract, there is no inherent or fundamental right to preference by virtue of seniority in service." Casey v. Brotherhood of L. F. & E. 197 Minn. 189, 192, 266 N. W. 737, 738. There is no claim here that any right of seniority was given by contract; and, the statute being silent on the right of seniority as between tenure teachers, this court has no power, by interpretation, to incorporate into the statute a mandate which it does not contain. "* * * the right * * * must be found in the statute, or it does not exist." Downs v. Board of Education, 126 N. J. L. 11, 16 A. (2d) 197, 198.

Concededly, a school board has no power, either openly or by subterfuge, to fix a compulsory retirement age in the absence of statutory authority. School City of Evansville v. Culver, 94 Ind. App. 692, 182 N. E. 270. But this is not the equivalent of stating that where the statutory ground, "lack of pupils," exists the board may not take age into consideration as a factor in determining which teacher to discharge.

Justice Stone suggested in the Evens case, 195 Minn. 563, 566, 262 N. W. 681, 682, 263 N. W. 912, 266 N. W. 736, that rights of seniority are well recognized in industrial employment and "rest upon obviously sound policy, well calculated to promote industrial peace and justice." But schools are not industries; and, as we have already indicated, a sound educational policy might well dictate that the younger, more vigorous, and more recently graduated instructors with modern methods be preferred over the older teachers whose vigor has declined and whose own training

and specialized study have not in all cases been kept up to date.

Of course, if respondents' removal was simply to make way for someone else and there was actually no "discontinuance of position or lack of pupils," they were wrongfully discharged, for the action of the board in such case would have been arbitrary and without statutory ground. Teacher tenure laws, like civil service laws, cannot be evaded by a sham or pretended discontinuance of a position. 10 Am. Jur., Civil Service, p. 933, § 12; 4 A. L. R. 209; State ex rel. Bass v. Vernon Parish School Board (La. App.) 194 So. 74; Garvey v. City of Lowell, 199 Mass. 47, 85 N. E. 182, 127 A. S. R. 468; Seidel v. Board of Education, 110 N. J. L. 31, 164 A. 901; Downs v. Board of Education, 126 N. J. L. 11, 16 A. (2d) 197; Ehret v. Kulpmont School Dist. 333 Pa. 518, 5 A. (2d) 188; Miller v. Stoudnour, 148 Pa. Sup. 567, 26 A. (2d) 113; State ex rel. Karnes v. Board of Regents, 222 Wis. 542, 269 N. W. 284; but see Weider v. Board of Education, 112 N. J. L. 289, 170 A. 631.

The isolated fact that a woman teacher is married cannot be made a ground for her discharge where no such ground is specified by statute, Oxman v. Independent School Dist. 178 Minn. 422, 227 N. W. 351; but where the lack of pupils or discontinuance of a position creates a statutory ground for discharge, the fact that a teacher may be married and receiving support from her husband, as well as the fact that she is entitled to substantial benefits from the retirement fund, is a legitimate factor to consider on the question of whether she or some other teacher without a husband, with smaller retirement benefits and no other source of income, should be the one to be discharged.

School districts may, as a matter of policy, adopt a rule not to employ married women teachers. McQuaid v. State ex rel. Sigler, 211 Ind. 595, 6 N. E. (2d) 547, 118 A. L. R. 1079 (reviewing authorities); Houghton v. School Committee, 306 Mass. 542, 28 N. E. (2d) 1001; Sheldon v. School Committee, 276 Mass. 230, 177 N. E. 94; Coleman v. School District, 87 N. H. 465, 183 A. 586; Ansorge v. City of Green Bay, 198 Wis. 320, 224 N. W. 119.

For the same reason, where a statutory ground of removal is created by loss of pupils, they may adopt a rule that marriage should be considered a factor in determining which teachers to discharge. Likewise, the economic status of the teacher, her dependency upon her job or lack of complete dependency thereon by reason of her marriage, would be a proper factor for the board to consider as between two or more teachers otherwise equally qualified for the remaining positions.

The distinction between the two situations is well illustrated in Downs v. Board of Education, 126 N. J. L. 11, 171 A. 528, where, because of a drop in population, loss of pupils, and a financial collapse, two schools were closed and a number of teachers discharged. The teachers marked for dismissal were those who lived outside the city and those who were married. It was claimed that this was an arbitrary basis, but the court pointed out that the dismissal of married teachers and teachers who lived outside the city, both tenure teachers, and giving preference of employment to residents of the school district and those who normally would be dependent upon themselves for livelihood was not an abuse of discretion or evidence of bad faith. True, the New Jersey statute, unlike our statute, did not require charges, notice, and hearing in case of a discharge on the ground of diminution of the number of pupils, yet the principle involved is the same, for under neither statute could the school board act arbitrarily or in bad faith.

In Lazaran v. School District, Pa. Common Pleas (1940), 3 Fayette Legal Journal, 199, involving a similar situation, it was held that where a number of teachers employed by a school district have equal seniority rights any of them are subject to suspension at the election of the board, and those who are suspended are not prejudiced by the failure of the board to suspend others.

In one instance the tenure teacher is discharged solely on the nonstatutory ground of marriage, nonresidence, financial independence, or advanced age; in the other, on the statutory ground of "discontinuance of position" or "lack of pupils," and in determining what teachers are to be discharged on the latter ground the

school board takes into consideration the factor of marriage plus a contributing husband, residence, length of service and its accompanying beneficial rights, health, age, vigor, or other like circumstances. The cause of the discharge in the latter case is discontinuance of position or lack of pupils, and not the factor or combination of factors enumerated.

Turning, then, to the case before us, the first question presented is whether the board acted upon a correct theory of law, i. e., a correct interpretation of the tenure act, in deciding that the respective positions of the respondents had in fact been "discontinued on account of lack of pupils in the schools of said district" as charged and determined by the board.

The board argues that the "cause for discharge" in each case was "lack of pupils" and not the "discontinuance of position," but its charges and decision establish the contrary. Conceivably, a position may be discontinued for reasons other than lack of pupils, as where a school building is destroyed or where the board decides to abolish instruction in a particular field of education. Conversely, lack of pupils does not in all cases result in a discontinuance of teaching positions, for the board may decide to reduce the size of classes to compensate for the loss of pupils. But we cannot conceive how a lack of pupils can be a cause for discharge unless the position of one or more teachers is discontinued by reason thereof. Here, however, the board expressly charged, found as a fact, and decided that the "position" of each of the respondents was "discontinued on account of lack of pupils." Consequently, *"discontinuance of position,"* as well as "lack of pupils," must be considered as having been a cause of discharge.

What did the legislature mean by the word "position" in authorizing the discharge or demotion of a tenure teacher on the ground of "discontinuance of position?"

Respondents' counsel argue that "Mr. Ging's position was that of teacher of sociology and history in Room 100, Central High School, and head of the Social Science Department. * * * His position was localized * * * [in] the room where he had taught

for 25 years"; that Miss Bunting's position was in no sense discontinued, because "the room in which she has taught for years continues with another teacher in it." This argument is at least partially unsound.

The doctrine of prescription cannot apply to the situation. Though respondents were assigned to the same schoolrooms for decades, the possession of each was permissive and as an employe of the school district, and neither thereby acquired any prescriptive rights as against the employer school district. The tenure act has not taken from a school board its power to "superintend and manage the schools of the district" (see L. 1941, c. 169, art. VI, §§ 1, 6[9], Minn. St. 1941, §§ 125.01, 125.06, subd. 9), and its incidental powers, through its superintendent, originally to assign and subsequently to transfer a teacher to such classroom, such building, and such division as it may determine to be for the best interest of the school, provided the teacher is not thereby demoted. Ganaposki's Appeal, 332 Pa. 550, 2 A. (2d) 742, 119 A. L. R. 815. If for any reason sufficient classes are not available for all tenure teachers, the board and superintendent should and do have the power, in good faith, to shift and rearrange the teaching force without reference to prescriptive rights of any single teacher to a particular classroom, building, or division of the school system. Cullen v. Board of Education, 126 Cal. App. 510, 15 P. (2d) 227, 16 P. (2d) 272, and Mitchell v. Board of Trustees, 5 Cal. App. (2d) 64, 42 P. (2d) 397, *infra;* Loehr v. Board of Education, 12 Cal. App. 671, 108 P. 325; Underwood v. Board of Public Education, 25 Ga. App. 634, 104 S. E. 90; People ex rel. McCoy v. McCahey, 296 Ill. App. 310, 15 N. E. (2d) 988; Alexander v. School District, 84 Or. 172, 164 P. 711; Annotation, 103 A. L. R. 1382; Miller v. Stoudnour, 148 Pa. Sup. 567, 26 A. (2d) 113. Notwithstanding a teacher has acquired tenure status, he may be so transferred from class to class, or building to building, or division to division without a resulting "discontinuance of position," and without seeming loss of caste, provided he is not thereby demoted. But though the power so to transfer teachers unquestionably ex-

ists, it must be exercised in good faith and for the best interest of the school district and must be based upon actually existing school conditions (Neal v. Board of Education, 116 W. Va. 435, 181 S. E. 541; White v. Board of Education, 117 W. Va. 114, 184 S. E. 264, 103 A. L. R. 1376), and not for the purpose of compelling a teacher's resignation, Mitchell v. Board of Trustees, 5 Cal. App. (2d) 64, 42 P. (2d) 397.

We cannot, however, sustain the extreme point of view taken by the school board. The theory upon which its charges were preferred, its findings made, and its decision rendered was that there is only one species of tenure teacher, that of "teacher of said School District," and only one type or grade of position, that of "position in said School District." It contends that a teacher attains tenure in the school system as a whole and that the tenure vested by law is the right to continue to teach the service indicated on the teacher's certificate. On this premise the board argues that every teacher qualified by certificate to teach a particular high school subject, e. g., history, English, chemistry, etc., holds a position to teach that subject regardless of whether he was employed or assigned to teach it, or whether it is one of his major or minor subjects as those terms are used in colleges and universities. This position or right, it insists, is equal in rank to that of another teacher actually hired and assigned to teach that subject because of special qualifications. This rule would permit the board to transfer an English teacher with a minor in history to the history department, to which he had previously never been assigned, even though a regularly employed history teacher with tenure rights thereby lost his position, as did respondent Ging in the instant case. This argument requires a look at the statutes upon which counsel rely.

Minn. St. 1941, § 130.05 (Mason St. 1927, § 2900-4), classifies teachers' certificates as follows:

"1. Elementary School Certificate,
"2. High School Certificate,
"3. Junior College Certificate,

"4. Administrative and Supervisory Certificates, and

"5. Vocational, Recreation, and Adult Education Certificates."

Subsequent sections of the law classify each of these five general types of certificates into special, limited, standard, general, and advanced certificates, in each case specifying what grades and subjects each kind shall qualify the holder to teach.

The possible results of our reading into the tenure act these separate and distinct provisions of our school code cannot be forecast. A holding that a teacher tenure position extended to and included the right to teach any subject, major or minor, for which he held a certificate, regardless of whether he was employed or assigned to teach such subject, and that such right was equal to that of another teacher specially qualified to teach a subject and employed for that reason might be a "consummation devoutly to be wished" by the teaching profession, but certainly not by a board desiring to improve the educational standards of its schools. It would complicate rather than simplify the administration of the schools, and this to their definite disadvantage. The statutes referred to merely fix the qualifications for teaching "positions" and do not make a teacher's "qualifications" and his "position" co-extensive. In fact, the contrary is indicated by § 130.03, which defines a qualified teacher as "one holding a valid certificate from the state board of education, as hereinafter provided, to perform *the particular service for which he is employed in a public school.*"

Furthermore, such an interpretation entirely ignores the "common and approved usage" of the word "position," which, under the canons of statutory construction (Minn. St. 1941, § 645.08 [L. 1941, c. 492, § 8]), must be one of our guides. One of the approved definitions of "position" is "relative place, situation, or standing; specif., * * * official rank or status." Webster's New International Dictionary (2 ed.) 1938. Common synonyms are: "Place, situation, billet, post, berth; *spec.* office, bed, incumbency, dignity, intendancy * * * portfolio * * * professorship, * * * etc." Allen, Synonyms and Antonyms. Webster's definition fits

the tenure act well. The act, though containing no definition of the term, uses it significantly in several sections.

Section 130.22, subd. 5, defines "demote" to mean "to reduce in rank or to transfer to a lower branch of the service or to a *position* carrying a lower salary or compensation." This indicates that in the legislative mind a reduction in rank or a transfer to a lower branch of the service, as well as to a "position carrying a lower salary or compensation," constitutes demotion or loss of position, "position" as used in the quoted section being the generic term, and "rank," "branch of the service," and comparative "salary or compensation" being criteria of the particular type or grade of position held.

Section 130.24 provides that "after the completion of such probationary period, without discharge, such teachers as are thereupon reëmployed shall continue in service and hold their respective *position* during good behavior," etc. This indicates that the particular "service" performed at the time of the transition from probationary to tenure status is also a criterion of "position."

Section 130.25 enumerates the "causes for the discharge or demotion of a teacher either during or after the probationary period," including "discontinuance of *position* or lack of pupils." This indicates that a position may be acquired and discontinued during, as well as after, the probationary period. Hence the acquisition of tenure rights is definitely not a prerequisite and not a criterion. This section also indicates that a position may continue notwithstanding a lack of pupils and may be discontinued notwithstanding there may be no lack of pupils. Hence sufficiency of pupils is not a criterion.

Section 130.29, while not using the word "position," significantly provides that "if the charges, or any of such, are found to be true, the school board or commissioner * * * shall discharge, *demote*, or suspend the teacher, as seems to be for the best interest of the school," again indicating that there are different ranks or grades of teachers' positions.

Section 130.32 provides: "Any teacher whose services are terminated on account of discontinuance of *position* or lack of pupils shall receive first consideration for other *positions* in the district for which she is qualified." This indicates that a teacher may hold but one position, yet be qualified for more than one, and that a separate position exists for each subject or group of subjects "for which she is qualified." This supplies a final criterion.

We see no alternative than to follow "common and approved usage" and to define a teacher's position as his relative place, rank, or standing in the school system. At the same time we must apply the criteria suggested by the tenure law itself and by § 130.03 of the school code above quoted in determining what his exact position is.

The question being *res novo* in Minnesota, decisions from other states have been helpful in determining precisely what is meant by the statutory term "position." It is true that the statutes of no two states are identical, but the purpose for which they are enacted is the same.

The decisions from California, Kennedy v. Board of Education (1890), 82 Cal. 483, 22 P. 1042; Cullen v. Board of Education, 126 Cal. App. 510, 15 P. (2d) 227; Anderson v. Board of Education, 126 Cal. App. 514, 15 P (2d) 774, 16 P. (2d) 272; Mitchell v. Board of Trustees, 5 Cal. App. (2d) 64, 42 P. (2d) 397; as well as those from New York, People ex rel. Callahan v. Board of Education, 174 N. Y. 169, 66 N. E. 674; and from Louisiana, State ex rel. Bass v. Vernon Parish School Board (La. App.) 194 So. 74, confirm our opinion that although "position" is not allocated to any particular room, building, or division, the term is not synonymous with "qualifications to teach," but means rank, grade, or station in the school system as determined by the several factors or criteria indicated in the tenure act itself.

Cases tending to reach a conclusion that is contrary to ours have been examined and fully considered, but, insofar as they hold that tenure laws do not secure to teachers any definite position, we decline to follow them. These include People ex rel. Mc-

Coy v. McCahey, 296 Ill. App. 310, 15 N. E. (2d) 988; School City of Peru v. State ex rel. Youngblood, 212 Ind. 255, 7 N. E. (2d) 176, 1002, 9 N. E. (2d) 80; Boody v. School Committee, 276 Mass. 134, 177 N. E. 78; Downey v. School Committee, 305 Mass. 329, 25 N. E. (2d) 738; Alexander v. School District, 84 Or. 172, 164 P. 711; Bragg v. School District, 337 Pa. 363, 11 A. (2d) 152.

■ Tested by the definition we adopt, the position of respondent Ging was that of head of the social science department and teacher of sociology and history in the high schools, and that of respondent Bunting was that of a teacher in the primary grades of the elementary schools.

It is quite significant that the school records sustain us in our conclusion as to what constituted Ging's position. Particularly persuasive are the teachers' assignment cards which teachers were required to sign each year before receiving their respective assignments. Exhibit R is Ging's assignment card dated March 30, 1937, which reads:

"Present Position
"4. Bldg. D. C. H. S. 5. Grades 10-12
"6. Subjects Sociology, Anc. Hist."

His assignment cards dated 1938, 1939, and 1940 (Exhibits Q, P, O) bear similar recitals. Likewise, the formal program reports covering Ging's annual programs, beginning with the school year 1931-1932 through the school year 1940-1941 (Exhibit S), list the subjects taught by him as sociology and ancient history, and most significantly recite that he is *"Head Social Science Dept."* These exhibits point definitely to the conclusion that Ging's position was that of head of the social science department and teacher of sociology and ancient history.

Inasmuch as the board proceeded upon the erroneous theory that Ging's position was that of a "teacher of said district," the trial court was correct in reversing its action. Unless and until Ging's position as head of the social science department and teacher of sociology and history was discontinued, the board had

absolutely no right to demote or discharge him. Here the only charge against him was that his position as a "teacher of said School District has necessarily been discontinued," and the board's findings and decision were that his position "as a teacher of said district" was discontinued. Not only were the charges indefinite, but evidence is wholly lacking to show that the *position* of Ging, as we have defined it, was in fact discontinued.

■ Likewise, in the case of respondent Bunting, the charges were preferred and the findings and decision made on the theory that Miss Bunting's position was that of a teacher in the school district; yet it conclusively appeared that during her entire 40 years at Duluth she was assigned exclusively to the primary grades of the elementary division of the school. That teachers in the primary, intermediate, and grammar grades respectively occupy separate and distinct positions in the school system should be self-evident, notwithstanding all grades below high school are, for convenience, grouped into one elementary division. Teachers who are efficient kindergarten or primary teachers and hired for that purpose and assigned to that work may generally be inefficient in the intermediate or grammar grades, where older pupils are taught, and vice versa. See People ex rel. Callahan v. Board of Education, 174 N. Y. 169, 66 N. E. 674. When a teacher has been assigned to the teaching of primary grades for a period sufficient to establish tenure rights, she should have priority over teachers from the intermediate or grammar grades notwithstanding the tenure rights of each are the same. Once a teacher has acquired a position as a primary teacher, the transfer of teachers from the upper grades to fill a position which would otherwise be hers is clearly arbitrary and based upon an erroneous theory of law. The board having in the case of Miss Bunting also proceeded upon the erroneous theory that her position was in the school system as a whole, we conclude that the lower court was correct in reversing the board's action. To justify her discharge on the ground of discontinuance of position, it was not sufficient to establish merely a lack of pupils in the school system as a whole or a reduction in

the number of teaching positions in the schools as a whole, but it was necessary to establish that the *position* which Miss Bunting held in the primary grades had been discontinued or that the number of such positions in the entire system had been necessarily reduced so as to require a reduction in the number of primary teachers having tenure rights. The board could not, on the basis of the loss of enrollment in the school system as a whole, shift its teachers from position to position in disregard of the rights of tenure teachers.

Granting that the board had the right to reduce the number of teachers in the primary department on account of lack of pupils, the tenure law would be a mere gesture if teachers holding positions in the intermediate or grammar grades could be transferred to the primary grades in disregard of the rights of a teacher with tenure rights holding a position in the primary grades. If after procuring voluntary retirements there remained a position in the primary grades for Miss Bunting, she was clearly entitled thereto as against any claim of tenure teachers whose position up to that time had been in the intermediate or grammar grades.

The board having conducted its entire proceedings upon an erroneous theory of law as to what constitutes a *position* in a school system, its orders discharging the respondents were therefore properly reversed by the lower court. But, having laid bare the erroneous theory upon which the board proceeded, both the lower court and this court exhausted their judicial power of review. What the board would have done, proceeding upon a correct theory, cannot be known. Had the lower court merely reversed the board's decisions, its orders would have been entirely proper, and an affirmance by this court would necessarily follow. The lower court, however, did not stop at a reversal, but ordered judgment "that the decision of said Board of Education * * * be, and it is, set aside and vacated," and "that the charges above mentioned should be physically expunged from the records of said Board of Education of the City of Duluth as required by

law." The lower court correctly reversed the order of the school board, but itself erred in directing judgment as above set out. The board having determined the administrative question before it with the incorrect view of law in mind, upon reversal, the lower court, without attempting to decide the case on its merits, should have remanded the proceedings to the board and directed it to proceed under the correct theory. Brazil v. County of Sibley, 148 Minn. 164, 181 N. W. 329. This is familiar practice. The remand is made to permit further evidence to be taken or additional findings to be made in accordance with the applicable law.

"Such a remand does not dismiss or terminate the administrative proceeding. * * * If further evidence is necessary and available to supply the basis for findings on material points, that evidence may be taken. * * * Whatever findings or order may subsequently be made will be subject to challenge if not adequately supported or the Board has failed to act in accordance with the statutory requirements." Ford Motor Co. v. National L. R. Board, 305 U. S. 364, 374, 59 S. Ct. 301, 307, 83 L. ed. 221.

In view of the necessity that the case be retried before the school board, we have gone to considerable length in explaining not only the correct theory to be followed by the school board in determining whether grounds for discharge existed, but also in discussing the power of the board of education to adopt rules and policies to be followed in selecting the particular teachers for discharge once the ground for discharge of one or more teachers is established.

We think it proper also to dispose of one other claim of respondent Ging which we consider untenable. The record discloses that a number of nontenure teachers assigned to such special fields as music, vocational training, home training, and physical education were also assigned to teach some academic subjects. When these special-class teachers were assigned to a building, the superintendent aimed to give them a full teaching load, which was 25 hours of actual teaching or study hall work per

week, or five classes per day. If such special-class teacher was assigned to a building and the special-class load was less than 25 hours, he or she was assigned to academic subjects to fill out his or her schedule.

It is charged that such divided assignments were given under a deliberate plan where teachers were employed in special fields and assigned thereto during their probationary periods, and upon acquiring permanent status were transferred to full-time academic work; that new teachers were then hired in the special fields and the process repeated from year to year. Respondents insist that the operation of this "vicious circle" eventually resulted in the discharge of tenure teachers in the academic fields under the pretext that there were not enough positions to go around. It is argued that the effect of the practice was to prefer nontenure teachers over tenure teachers, contrary to the provisions of the tenure law.

Had such practice been generally or extensively invoked with a view to creating a colorable surplus of teachers in the academic field and thereby providing an ostensible, though fictitious, ground for discharging older tenure teachers in the academic fields, judicial interference on the ground of arbitrariness and bad faith would be justified. But the proof is lacking.

The first two instances cited as creating a "vicious circle" are of a man teacher and a woman teacher who in 1940 taught physical education exclusively, dividing their time between Franklin Junior High School and the grades. It was found disadvantageous not to have such teachers available at a school during the entire day, and accordingly they were assigned to both physical education and academic work at one school only. Nevertheless, the same number of exclusively academic teachers was retained at the school.

Glenn Card, a tenure teacher, taught physical education and junior business at the Stowe School in 1940. In 1941 he was transferred to Denfield High School to teach Spanish rather than

have a nontenure teacher teach that subject, because Spanish teachers were not readily available. This, however, left a vacancy in the position at the Stowe School, later filled by employment of a nontenure teacher. The shift merely meant the employment of a nontenure physical education teacher instead of a nontenure Spanish teacher.

Only one other such situation needs special mention, that of David Cawthorne, a nontenure teacher hired as a band instructor, who also taught history. His history assignment is the only one held by a nontenure teacher for which respondent Ging had the necessary teaching qualifications. Cawthorne's band classes required only two periods of teaching time, and he was therefore assigned three history classes to complete the required five periods per day.

A similar situation was disposed of in Weider v. Board of Education, 112 N. J. L. 289, 170 A. 631. The tenure teacher in that case taught physical training, dividing her time between grades and high school. A demand arose for additional teaching hours in high school English. The board spread the physical training instruction in the grades among teachers of other subjects and employed a new nontenure teacher to teach English and physical training in high school. Disposing of the situation, the New Jersey court said (112 N. J. L. 291, 170 A. 631):

"The action of the board was an abolishment of the position of, exclusively, physical instructor, and the creation, at reduced expense, of a new position involving the teaching of another subject which Mrs. Weider could not teach and the performance of other duties. The evidence discloses a public economy, * * * but not a discrimination against the prosecutrix."

We likewise hold that the practice followed by the Duluth school board did not violate either the letter or the spirit of the tenure law, though the cumulative effect of a number of such instances might result in depriving a tenure teacher of a position. The question here is whether the board acts in good faith or arbitrar-

ily. The problem is administrative and not judicial. Accordingly, when a teacher is required for a special subject requiring less than a full teaching schedule and for which no tenure teacher is available, the board may, in good faith, assign academic classes to that teacher in order to give him a full teaching load, thereby creating a new position; and this though tenure teachers may be available for the academic classes. The interest of the tenure teacher must, in such instances, be subordinated to the interest of the public and the welfare of the children of the school district.

Remanded with directions to enter judgment below reversing the action of the school board and directing it to proceed in conformity with this decision.