**Bernice ELLERBROCK, Appellant,**

v.

**BOARD OF EDUCATION, SPECIAL SCHOOL DISTRICT NO. 6, Respondent.**

**No. 48132.**

Supreme Court of Minnesota.

July 21, 1978.

Thuet & Lynch and Thomas W. Pugh, South St. Paul, for appellant.

Peterson, Popovich, Knutson & Flynn, St. Paul, and John Roszak, South St. Paul, for respondent.

Heard before SHERAN, C. J., and RO-GOSHESKE and SCOTT, JJ., and considered and decided by the court en banc.

SHERAN, Chief Justice.

This is an appeal from an order of district court discharging petitioner's writ of certio-

rari and affirming respondent School Board's decision that petitioner received a proper seniority number in conformity with the master contract between respondent and the South Saint Paul Federation of Teachers (the Federation).

Petitioner was first hired by respondent on June 9, 1954. At that time respondent had no formal maternity leave policy, and women teachers who became pregnant were forced to resign their positions. Pursuant to this policy, petitioner resigned her teaching position effective December 15, 1955. After her child was born, she did some tutoring and substitute teaching, but she did not seek a full-time teaching position with respondent until 1969.[1]

Some time after 1955 respondent modified its policy of hiring teachers without degrees from four-year colleges or universities. Since petitioner had possessed only a two-year teaching certificate when she was originally hired by respondent, she had to upgrade her education before she would be considered for a full-time teaching position.

Petitioner completed her college education in 1969 and executed her second contract with respondent on April 7, 1969. She

1. At the hearing petitioner sought before the school board to challenge her placement on unrequested leave, she testified that she did not want a full-time job until 1969 and that she had never asked to be rehired until then, even though, because of the board's policy of requiring a bachelor's degree, she could not have qualified for a full-time teaching position.

2. She was placed on unrequested leave of absence for a two-week period in June of 1975, but she was rehired immediately.

3. Minn.St. 125.12, subd. 6a states: "The school board and the exclusive bargaining representative of the teachers may negotiate a plan providing for unrequested leave of absence without pay or fringe benefits for as many teachers as may be necessary because of discontinuance of position, lack of pupils, financial limitations, or merger of classes caused by consolidation of districts. Failing to successfully negotiate such a plan by the beginning date of a new master contract, the provisions of subdivision 6b shall apply. The provisions of section 179.72 shall not apply for the purposes of this subdivision."

Since respondent and the Federation negotiated such a plan, subdivision 6b is inapplicable to this lawsuit.

continued in the employment of respondent until being placed on unrequested leave of absence at the end of the 1976–77 school year.[2]

Under the Public Employment Labor Relations Act of 1971 (PELRA), codified at Minn.St. 179.61 to 179.76, respondent and the Federation, the exclusive representative of the teachers in the district, were authorized to negotiate a Master Agreement. Minn.St. 179.61, 179.70, subd. 1. The Master Agreement at issue in this lawsuit was negotiated on October 16, 1974. In 1974, the legislature amended Minn.St. 125.12, which governs individual teacher contracts, to permit school districts, after negotiating the procedures to be followed with the teachers' union, to place tenured teachers on unrequested leaves of absence for "discontinuance of position, lack of pupils, financial limitations, or merger of classes caused by consolidation of districts." Minn.St. 125.12, subd. 6a.[3] Provisions to this effect were included as Article XIII of the Master Agreement at issue here.[4]

On November 13, 1975, respondent and the Federation executed an amendment to the 1974–75 Master Agreement which es-

4. "Article XIII

"UNREQUESTED LEAVE OF ABSENCE AND SENIORITY POLICY

"Section 1. Purpose: The purpose of this policy is to implement the provisions of M.S. 125.12, Subd. 6a, which policy, when adopted, shall constitute a plan for unrequested leave because of discontinuance of position, lack of pupils, financial limitations or merger of classes caused by consolidation of districts.

"Section 2. Definitions:

* * * * * *

"Subd. 2. 'Teacher' means a continuing contract teacher who is a member of the appropriate unit as defined in this Agreement. Upon becoming a continuing contract teacher, a teacher's seniority date shall be determined pursuant to Subd. 4 of this section.

* * * * * *

"Subd. 4. A teacher's seniority standing shall be determined by the date on which the teacher executed the initial individual contract involving continuous service in the school district. If two or more employees executed such individual contract on the same date, the earliest in time shall be considered the senior employee.

tablished a mechanism for adjusting the seniority of women teachers with "a break in continuous service in the past related to maternity reasons."[5] The effect of this

\* \* \* \* \* \*

"*Section 3. Unrequested Leave of Absences*:

"*Subd. 1.* The school district may place on unrequested leave of absence for a period not exceeding three calendar years from the time such leave is commenced, without pay or fringe benefits, such teachers as may be necessary because of discontinuance of position, lack of pupils, financial limitations, or merger of classes. Such leave shall be effective no later than the close of the school year or at such earlier time as mutually agreed between the teacher and the school district.

"*Subd. 2.* Teachers placed on such leave shall receive notice pursuant to M.S. 125.12.

"*Subd. 3.* Teachers placed on unrequested leave shall be done in inverse order of seniority in the subject matter categories covered by this Agreement. No teacher shall be placed on unrequested leave if there is any other qualified teacher with less seniority in the same subject matter category.

\* \* \* \* \* \*

"*Section 5. Establishment of Seniority List*:

"*Subd. 1.* The school district shall cause a seniority list (by name, date of individual contract execution, certification in subject matter category) to be prepared from its records. It shall thereupon post such list in an official place in each school building of the district.

"*Subd. 2.* Any person whose name appears on such list and who may disagree with the findings of the school district and the order of seniority in said list shall have 10 days from the date of posting to supply written documentation, proof and request for seniority change to the school district.

"*Subd. 3.* Within 10 days thereafter, the school district shall evaluate any and all such written communications regarding the order of seniority contained in said list and may make such changes the school district deems warranted. A final seniority list shall thereupon be prepared by the school district, which list as revised shall be binding on the school district and any teacher. Each year thereafter the school district shall cause such seniority list to be up-dated to reflect any addition or deletion of personnel caused by retirement, death, resignation, other cessation of services, or new employees. Such yearly revised list shall govern the application of the unrequested leave of absence policy until thereafter revised.

"*Section 7. Effect*: This article shall be effective at the beginning date of this Agreement and shall be governed by its duration clause. This article shall govern all teachers as defined therein and shall not be construed to limit the rights of any other certified employee not covered by this Agreement or other Agreement affecting such certified employee.

5. The amendment reads in pertinent part as follows:

"THIS AGREEMENT is entered into between Special School District No. 6 (hereinafter referred to as the School District) and the South St. Paul Federation of Teachers, the exclusive representative of South St. Paul teachers (hereinafter referred to as the Federation).

"WHEREAS, the School District and the Federation are parties to a Collective Bargaining Agreement dated October 16, 1974 (hereinafter referred to as the Agreement), and

\* \* \* \* \* \*

"WHEREAS, Article XIII of said Agreement provides for a seniority system, and

"WHEREAS, under said Agreement a teacher's seniority date is defined as that date on which the teacher executed the initial individual contract involving continuous service in the School District, and

"WHEREAS, pursuant to Article XII of such Agreement, seniority accrues on leaves of absence, including Article XII, Section 8, which provides for maternity leave, and

"WHEREAS, there are currently teachers in the employ of the School District as contracted teachers, which teachers had a break in service related to maternity reasons in the years 1957 and 1968, and

"WHEREAS, during said years there was no provision giving the teachers a right to a maternity leave, and

"WHEREAS, one of said teachers has filed charges with the Equal Employment Opportunity Commission and the Minnesota Department of Human Rights, alleging that she is prejudiced by the definition establishing her seniority date because of alleged discrimination in failing to provide teachers with a maternity leave at the time of said break in continuous service.

"WHEREAS, both parties desire to resolve said complaint and potential future complaints of a similar nature.

"THEREFORE, IT IS UNDERSTOOD AND AGREED by the parties as follows:

"1. Those teachers currently contracted by the School District, with a break in continuous service in the past related to maternity reasons, whether such break in service was classified as a 'leave', a 'resignation', a 'termination', or otherwise, shall be deemed to have been on maternity leaves of absence within the meaning of Article XII, Section 8, and, therefore, such teacher shall be deemed to have continuous service within the meaning of Article XII and the seniority list in effect as of the date of execution of this Agreement shall be modified

amendment was to treat the break in service as a retroactive maternity leave for which no seniority is lost and thus to compute seniority from the date of the initial contract between the teacher and respondent. After negotiations between respondent and the Federation over the number of women to be included in the amendment's effect, five women teachers had their seniority numbers modified. The breaks in service of these women ranged from under 1 year to 2 years and 17 days. Petitioner was not among those benefited.

The 1975 seniority list was posted in December of 1975. Although petitioner's seniority number was the same in 1975 as in 1976, she did not formally object to her seniority number at that time. When the 1976 seniority list was posted on December 1, 1976, petitioner was proposed for placement on unrequested leave of absence. Pursuant to Article XIII of the Master Agreement, and within the time limit specified therein, she requested a hearing to object to her seniority number of 232. Following her hearing she was placed on unrequested leave of absence.

Petitioner then sought a writ of certiorari in district court. After oral arguments presented by both sides, the trial court affirmed respondent's action and discharged the writ. The trial court found petitioner to be unprotected by the 1975 amendment to the Master Agreement:

"While Petitioner's resignation initially was for maternity reasons, her leave did not continue for 13 years solely for maternity reasons. It would be stretching both the letter and the spirit of this amendment to hold that it entitled Petitioner to a 13 year maternity leave of absence."

Petitioner's appeal to this court presents two issues for decision:

(1) Whether petitioner's failure to exhaust the remedies contemplated in the Master Agreement precludes access to the courts; and

(2) If not, whether the writ was properly discharged.

■ 1. It is clear that both PELRA and the Master Agreement contemplate that grievances be arbitrated rather than litigated in the courts. Minn.St. 179.70, subd. 1 ("All contracts shall include a grievance procedure which shall provide compulsory binding arbitration of grievances."); Article XV, § 8 of the Master Agreement. Moreover, Minnesota has a strong public policy of favoring arbitration as a means of resolving labor disputes. *State v. Berthiaume*, Minn., 259 N.W.2d 904 (1977); *In re Discharge of Johnson*, 288 Minn. 300, 180 N.W.2d 184 (1970); *Layne-Minnesota Co. v. Regents of the University*, 266 Minn. 284, 123 N.W.2d 371; Minn.St. 179.61 to 197.77, 572.08 to 572.30. Thus, ordinarily we would hold that petitioner's failure to grieve precludes her from having access to the courts at this time. *Cunningham v. Federal Cartridge Corp.*, 265 Minn. 534, 122 N.W.2d 208 (1963).

■ As we stated in *Cunningham, supra,* however, exceptions to the rule exist " * * * '[w]here it can be shown that the employer and union conspire together to defeat the rights of an employee or * * that it would be futile for the employee to seek redress under the contract * * *.'" 265 Minn. 537, 122 N.W.2d 211. Petitioner argues that because both the school superintendent and the union advised her that her problem was not grievable, she should not be precluded from asserting her rights in court under one of the exceptions.

Although we recognized exceptions in *Cunningham*, we also warned against the dangers of applying them too readily.

"Collective bargaining agreements are designed to promote harmonious labor relations. They would soon be emasculated if an employee could ignore established procedures by simply stating she believed

---

to provide such teachers with a seniority date consistent with the date on which the teacher executed her initial individual contract for employment as a teacher in the School District.

\* \* \* \* \* \*

"This Agreement shall constitute an amendment to the Collective Bargaining Agreement dated October 16, 1974, and shall remain in full force and effect unless and until modified by mutual agreement of the parties."

them to be futile." 265 Minn. 538, 122 N.W.2d 211.

In this case petitioner had a right to grieve the issue, and neither the approval of the superintendent nor of the union was re-

quired as a prerequisite.[6] Thus, she has not demonstrated the futility of the grievance procedure.

■ Despite our conclusion that petitioner should have utilized the grievance ma-

---

**6.** Attachment C to the Master Agreement governs the grievance procedure. In pertinent part it reads as follows:

"GRIEVANCE PROCEDURE

"*Section 1. Grievance Definition*: A 'grievance' shall mean an allegation by an employee resulting in a dispute or disagreement as to the interpretation or application of any term or terms of this Agreement.

"*Section 2. Representative*: The employee, administrator, or school board may be represented during any step of the procedure by any person or agent designated by such party to act in his behalf.

\* \* \* \* \* \*

"*Section 4. Time Limitation and Waiver*: Grievances shall not be valid for consideration unless the grievance is submitted in writing to the school board's designee, setting forth the facts and the specific provision of the Agreement allegedly violated and the particular relief sought within *twenty days* after the date the event giving rise to the grievance occurred, or within *twenty days* after the employee, through the use of reasonable diligence, should have had knowledge of the occurrence that gave rise to the grievance. Failure to file any grievance within such period shall be deemed a waiver thereof. Failure to appeal a grievance from one level to another within the time periods hereafter provided shall constitute a waiver of the grievance. An effort shall first be made to adjust an alleged grievance informally between the employee and the school board's designee.

\* \* \* \* \* \*

"*Section 8. Arbitration Procedures*: In the event that the employee and the school board are unable to resolve any grievance, the grievance may be submitted to arbitration as defined herein:

"*Subd. 1. Request*: A request to submit a grievance to arbitration must be in writing signed by the aggrieved party, and such request must be filed in the office of the superintendent within *ten days* following the decision in Level II or within *ten days* after the decision of the school board if the school board reviews a decision pursuant to Section 6 of the grievance procedure.

"*Subd. 2. Prior Procedure Required*: No grievance shall be considered by the arbitrator which has not been first duly processed in accordance with the grievance procedure and appeal provisions.

\* \* \* \* \* \*

"*Subd. 4. Submission of Grievance Information*:

"a) Upon appointment of the arbitrator, the appealing party shall within *twenty days* after

notice of appointment forward to the arbitrator, with a copy to the school board, the submission of the grievance which shall include the following:

"1) The issues involved.

"2) Statement of the facts.

"3) Position of the grievant.

"4) The written documents relating to Section 5, Article XVII of the grievance procedure.

"b) The school board may make a similar submission of information relating to the grievance either before or at the time of the hearing, with a copy to the grievant.

"*Subd. 5. Hearing*: The grievance shall be heard by a single arbitrator and both parties may be represented by such person or persons as they may choose and designate, and the parties shall have the right to a hearing at which time both parties will have the opportunity to submit evidence, offer testimony, and make oral or written arguments relating to the issues before the arbitrator. The proceeding before the arbitrator shall be a hearing de novo.

\* \* \* \* \* \*

"*Section 9. Grievance Form*: A form which must be used for filing of grievances, provided herein as Attachment D, shall be provided by the school district. Such form shall be readily accessible in all school buildings.

"Attachment D

"GRIEVANCE REPORT FORM
"South St. Paul Public Schools

"Name: _____ Building: _____

"Date Grievance Occurred:

"Statement of Facts:

"Specific Provisions of Agreement Allegedly Violated:

"Particular Relief Sought:

"Dated: _____    _____

Signature of Grievant

"Copies to: Superintendent
Assistant Superintendent
Principal
Federation"

chinery contained in the Master Agreement, her failure to do so is not devastating, because respondent did not object to the issuance of the writ below on this ground. *Skeim v. Independent School District No. 115*, 305 Minn. 464, 234 N.W.2d 806 (1975); *Anderson v. Twin Cities Rapid Transit Co.*, 250 Minn. 167, 84 N.W.2d 593 (1957). In *Skeim*, a case very similar to this one, the master contract contained a grievance procedure as required by Section 179.70 of PELRA. Yet, because the school board's answer did not allege failure to exhaust administrative remedies, we held that it "has waived whatever right it may have had to insist that the grievance procedure be followed." 305 Minn. 474, 234 N.W.2d 813. Respondent admitted at the oral argument that it never specifically requested dismissal on this ground.[7] Thus, we are compelled to hold that it waived its right to force petitioner to arbitrate her grievance.

■■■ 2. As we long ago stated in *State ex rel. Ging v. Board of Education of City of Duluth*, 213 Minn. 550, 571, 7 N.W.2d 544, 556 (1943), certiorari exists only to permit the court to determine whether or not respondent's findings of fact are arbitrary, capricious, or unreasonable. Thus, "neither the district court on *certiorari* nor this court on appeal [can] interfere with the school board in its decision as to the existence of statutory grounds for discharge, provided the board acted in good faith and on a correct interpretation of the law." 213 Minn. 571, 7 N.W.2d 556. The trial court, after reviewing the transcript of petitioner's hearing before the school board, found that respondent's decision not to adjust petitioner's seniority number was reasonable. Since petitioner has failed to persuade us that the trial court erred in discharging the writ of certiorari, we sustain the decision.

Affirmed.

OTIS and TODD, JJ., took no part in the consideration or decision of this case.

7. Since there is no transcript of the certiorari proceeding and no written briefs are included in the record transmitted to this court by the clerk of the trial court, we cannot know if respondent ever brought to the court's attention its position that the question should have

been grieved and arbitrated rather than litigated. Nowhere in the trial court's decision, however, is arbitrability ever discussed. Thus, we must assume that it was not directly raised or ruled upon below.